United States Courts
Southern District of Texas
ENTERED

AUG 3 1 2006

Michael N. Milby, Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **vs.** | § | **CRIMINAL NO. H-03-93** |
| | § | |
| | § | |
| **JOSEPH HIRKO (4)** | § | |

### AMENDED ORDER*

Pending before the Court is Defendant Joseph Hirko's Motion to Dismiss Counts 2 through 6, 25 and 26 of the Fifth Superseding Indictment and Counts 2 through 6 of the Seventh Superseding Indictment on Grounds of Collateral Estoppel **(Instrument No. 935)**, filed on December 8, 2005.

### I.

On March 11, 2003, the United States of America filed a multiple-count Indictment against Defendants Joseph Hirko, Kevin Howard, Scott Yeager, Rex Shelby, Michael Krautz (hereinafter "Defendants") and former Defendants Kenneth Rice and Kevin Hannon, charging them with conspiracy to commit wire fraud and securities fraud, and substantive counts of wire fraud, securities fraud, insider trading, and money laundering. The government filed a Fourth Superseding Indictment on July 22, 2004. (Instrument No. 340). On November 5, 2004, the government filed a Fifth Superseding Indictment. (Instrument No. 468). During the relevant times in the Indictment, Defendants served in various positions as executives to Enron Communications, Inc., later renamed as Enron Broadband Services ("EBS").

* This Order was amended to correct minor citation and typographical errors prior to publication.

In the Fifth Superseding Indictment, Count One charged Defendant Hirko with conspiracy to commit securities fraud and wire fraud. (Instrument No. 468). Count Two of the Indictment charged Defendant Hirko with the substantive offense of securities fraud in connection with alleged false statements and material omissions made at a January 20, 2000 Analyst Conference. (*Id.*). Counts Three through Six charged Defendant Hirko with the substantive offense of wire fraud in connection with press releases issued by Enron Broadband Services on January 31, 2000 through May 15, 2000. (*Id.*). Counts Twenty-Three through Twenty-Six charged Defendant Hirko with insider trading based on trades of Enron stock made on February 18, 2000 through May 12, 2000. (*Id.*). Counts One Hundred Seventy-Two through One Hundred Seventy-Four charged Defendant Hirko with insider trading based on trades of Enron stock made on January 23, 2001 through January 26, 2001. Counts One Hundred Seventy-Five through One Hundred Seventy-Six charged Defendant Hirko with money laundering based on transactions on January 30, 2001 through February 1, 2001. (*Id.*).[1]

On April 18, 2005, through July 13, 2005, this Court conducted a jury trial on all of the charges pending against the Defendants. On July 20, 2005, the jury returned a verdict of not guilty for Defendant Hirko on Counts 23 and 24 charging insider trading based on trades on February 18, 2000 and April 20, 2000, respectively. The jury also returned a verdict of not guilty for Defendant Hirko on Counts 55 through 66 charging money laundering based on transactions made in the year 2000. (Instrument No. 869). The jury did not enter a verdict on the conspiracy count (Count 1), wire

---

[1] Each of the Counts against Defendant Hirko incorporated the same factual allegations stated in Paragraphs 1 through 33 of the Indictment. Specifically, each Count stated that "[t]he allegations in paragraphs 1 through 33 . . . are realleged as if fully set forth here." The Counts then set forth the specific charges against Defendant Hirko. (*See, e.g.,* Count One, below).

fraud counts (Counts 2-6), two counts of insider trading based on trades in May 2000 (Counts 25-26), three counts of insider trading based on trades in January 2001 (Counts 172-174), and money laundering counts based on transactions in January and February 2001 (Counts 175-176). As to these counts, the jury indicated that they were hopelessly deadlocked. (*Id.*).

On November 9, 2005, the government filed a Seventh Superseding Indictment charging Defendant Hirko with conspiracy to commit securities and wire fraud, securities fraud related to alleged false statements and omissions made at the 2000 Analyst Conference, two counts of wire fraud for press releases issued on April 11, 2000 and May 15, 2000, two counts of insider trading for trades made in May 2000, and three counts of insider trading based on trades made in January and February 2001. (Instrument No. 915). The Seventh Superseding Indictment indicated the government's intention to retry Defendant Hirko on the conspiracy, securities fraud, wire fraud and insider trading counts for which the jury failed to render a verdict. (Instrument No. 915). The Seventh Superseding Indictment removes all of the counts on which Defendant Hirko received a verdict of not guilty, but the Indictment is based on factual allegations similar to those asserted in the Fifth Superseding Indictment. (*Id*). A comparison of the counts alleged in the Fifth Superseding Indictment and the Seventh Superseding Indictment is set forth below.

| United States v. Joseph Hirko (Cr. No. 03-0093-7) Conversion Chart for Counts Relating to Joseph Hirko | |
|---|---|
| **5th Superseding Indictment** <br> **United States v. Hirko, et al.** <br> **(Cr. No. 03-0093-5)** | **7th Superseding Indictment,** <br> **United States v. Hirko** <br> **(Cr. No. 03-0093-7)** |
| 1 <br> (Conspiracy to Commit Securities and Wire Fraud) | 1 |
| 2 <br> (Securities Fraud: 2000 Analyst Conference) | 2 |
| 3 <br> (Wire Fraud - 1/31/00 Press Release) | (Government elected not to include in Seventh Superseding Indictment) |
| 4 <br> (Wire Fraud - 3/30/00 Press Release) | (Government elected not to include in Seventh Superseding Indictment) |
| 5 <br> (Wire Fraud - 4/11/00 Press Release) | 3 |
| 6 <br> (Wire Fraud - 5/15/00 Press Release) | 4 |
| 23 <br> (Insider Trading, 2000 - Joseph Hirko) | (Jury Acquittal) |
| 24 <br> (Insider Trading, 2000 - Joseph Hirko) | (Jury Acquittal) |
| 25 <br> (Insider Trading, 2000 - Joseph Hirko) | 5 |
| 26 <br> (Insider Trading, 2000 - Joseph Hirko) | 6 |
| 55 - 66 <br> (Money Laundering, 2000 - Joseph Hirko) | (Jury Acquittal) |
| 172 <br> (Insider Trading, 2001 - Joseph Hirko) | 11 |
| 173 <br> (Insider Trading, 2001 - Joseph Hirko) | 12 |

4

| United States v. Joseph Hirko (Cr. No. 03-00093-7) Conversion Chart for Counts Relating to Joseph Hirko | |
|---|---|
| 174 (Insider Trading, 2001 - Joseph Hirko) | 13 |
| 175 - 176 (Money Laundering, 2001 - Joseph Hirko) | (Government elected not to include in Seventh Superseding Indictment) |

On December 8, 2006, Defendant Joseph Hirko filed a Motion to Dismiss Counts 2 through 6, 25 and 26 of the Fifth Superseding Indictment and Counts 2 through 6 of the Seventh Superseding Indictment on Grounds of Collateral Estoppel. (Instrument No. 969). Under the Double Jeopardy Clause of the Fifth Amendment and Doctrine of Collateral Estoppel, Defendant Hirko argues that the crimes charged in Counts 2 (securities fraud), Counts 3 through 6 (wire fraud), and Counts 25 and 26 (insider trading) of the Fifth Superseding Indictment; and Counts 2 (securities fraud), 3 and 4 (wire fraud), and 5 and 6 (insider trading) of the Seventh Superseding Indictment, were effectively litigated and decided against the government in the first trial. (Instrument No. 885). Defendant Hirko has not moved to dismiss Count 1 (conspiracy to commit wire and securities fraud) of the Fifth Superseding Indictment or Seventh Superseding Indictment. (*Id.*). Defendant Hirko has also not moved to dismiss Counts 172 through 174 of the Fifth Superseding Indictment or Counts 11 through 13 of the Seventh Superseding Indictment, which charge insider trading based on trades in January and February 2001.

In support of his Motion, Defendant Hirko argues that "the only rational basis on which the jury could have acquitted Mr. Hirko on the 2000 Money Laundering Counts and the February and April 2000 Insider Trading Counts is by finding that he did not engage in the alleged

5

misrepresentations and omissions that formed the common factual basis of the securities fraud, wire-fraud and insider-trading counts in the Fifth Superseding Indictment." (Instrument No. 935, at 5).

On December 28, 2005, the United States filed a Response to Defendant Hirko's Motion to Dismiss on Grounds of Collateral Estoppel. (Instrument No. 947). The government argues that "[Defendant Hirko's] reliance on generalized verdicts of acquittal on a few counts does not give rise to a conclusion that the jury must have reached a decision that he did not commit the essential elements of the offenses now at issue in the Fifth and Seventh Superseding Indictments." (*Id.* at 3). In addition, the government argues that "the record of the trial . . . fatally undermines Hirko's assertion that the jury's partial verdict acquitting him of counts 23-24 and counts 55-66 of the Fifth Superseding Indictment . . . means that the jury determined that he had not engaged in wire fraud, securities fraud, and insider trading as alleged in the Fifth Superseding indictments." (*Id.* at 3-4). Finally, the government contends that Defendant Hirko's Motion to Dismiss is frivolous and requests that the Court make such a finding in this Order, and proceed with trial as scheduled. (Instrument No. 985).

## II.

The Supreme Court has stated that the principle of collateral estoppel in criminal cases is embodied in the Fifth Amendment's proscription against double jeopardy. *Ashe v. Swenson*, 397 U.S. 436 (1970). Collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443. According to the Supreme Court:

6

The rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to examine the record of the prior proceeding, taking into account the pleadings, evidence, charge and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration. The inquiry must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.

*Id.* at 444 (internal citations and quotations omitted).

In the Fifth Circuit, collateral estoppel may affect successive criminal prosecutions in one of two ways. First, "it will completely bar a subsequent prosecution if one of the facts necessarily determined in the former trial is an essential element of the subsequent prosecution." *United States v. Brackett*, 113 F.3d 1396, 1398 (5th Cir. 1997). Second, "while the subsequent prosecution may proceed, collateral estoppel will bar the introduction or argumentation of facts necessarily decided in the prior proceeding." *Id.* (citing *United States v. Deerman*, 837 F.2d 684, 690 (5th Cir. 1988)). "Facts so established in the first trial may not be used in the second trial either as ultimate or as evidentiary facts." *United States v. Mock*, 604 F.2d 341, 343 (5th Cir. 1979).

It is axiomatic that "collateral estoppel bars relitigation only of those facts necessarily determined in the first trial." *Brackett*, 113 F.3d at 1398 (quoting *Deerman*, 837 F.2d at 690). "When a fact is not necessarily determined in a former trial, the possibility that it may have been does not prevent re-examination of that issue." *Id.* at 1398-99 (quoting *United States v. Lee*, 622 F.2d 787, 790 (5th Cir. 1980) (emphasis in original)). Thus, "the first step in resolving a claim of collateral estoppel is to determine which facts were 'necessarily decided' in the first trial." *Id.* at 1398 (citing *United States v. Levy*, 803 F.2d 1390, 1398-99 (5th Cir. 1986); *Mock*, 604 F.2d at 343). "At this first stage of the inquiry, the defendant bears the burden of demonstrating that the issue he seeks to

7

foreclose was 'necessarily decided' in the first trial." *Id.* (citing *Dowling v. United States*, 493 U.S. 342, 350 (1990)).

In a criminal case, the determination of what the jury necessarily decided can be an "awkward" task, because "a general verdict of acquittal does not specify the facts 'necessarily decided' by the jury." *Id.* at 1399. Thus, in making the determination of what the jury necessarily decided, the court "must examine allegations of the indictment, testimony, court's instructions to the jury, and jury's verdict to consider what makes the jury's verdict coherent." *Deerman*, 837 F.2d at 690. This inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." *Ashe*, 397 U.S. at 444 (quoting *Sealfon v. United States*, 332 U.S. 575, 579 (1948)). "Any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal." *Id.*

With these principles in mind, the Court first turns to the question of whether the government is completely barred from prosecuting Defendant Hirko on the charges contained in Counts 2 through 6, 25 and 26 of the Fifth Superseding Indictment and Counts 2 through 6 of the Seventh Superseding Indictment. Then, the Court will determine whether the government should be prohibited from offering evidence related to the counts upon which Defendant Hirko was acquitted in the first trial.

8

## III.

To resolve the issues presented by Defendant Hirko, the Court must review, among other things, the indictment, the jury charge and verdict, the theory of prosecution, the theory of defense, and the evidence presented at trial. The complexity of this determination is underscored by the incestuous nature of the factual allegations contained in the Indictment.

## A.

Paragraphs 1 through 33 of the Fifth Superseding Indictment provide a broad introduction to the Enron Broadband case and alleged schemes to defraud. (Instrument No. 468). Each of the counts on which Defendant Hirko received an acquittal (two counts of insider trading and twelve counts of money laundering) incorporate Paragraphs 1 through 33 of the Indictment. The remaining insider trading, securities fraud, wire fraud, and conspiracy counts, on which the jury deadlocked, also incorporate Paragraphs 1 through 33. Paragraphs 1 through 10 of the Indictment provide a background description of the parties and Enron Broadband Services. The following Paragraphs 11 through 33, entitled "THE SCHEMES TO DEFRAUD," provide a summary of the alleged schemes to defraud, including the proposal to build the Enron Intelligent Network, a description of alleged false press releases, alleged false statements made at the 2000 Analyst Conference, the Project Braveheart transaction, alleged false statements at the January 2001 Analyst Conference, and "The

Defendants' Stock Trading." (Instrument No. 468).[2] Specifically, Paragraph 11 of the Indictment

describes the overall summary of the schemes to defraud as follows:

> 11.    From at least April 1999 until May 14, 2001, defendants, JOSEPH
> HIRKO, KEVIN HOWARD, SCOTT YEAGER, REX SHELBY, and
> MICHAEL KRAUTZ, together with others, engaged in conduct and made
> false and misleading statements and omitted material information from
> statements made, all of which were designed to and did deceive the investing
> public and others about the technological capabilities, value, revenue and
> business performance of EBS.  The defendants executed this scheme by,
> among other means: (i) causing Enron to issue materially false and
> misleading press releases; (ii) making and causing others to make materially
> false and misleading statements to equity analysts and others; (iii) using
> fraudulent means to generate revenue so that EBS and Enron could appear to
> reach publicly declared financial targets; and (iv) failing to disclose material
> adverse information about EBS's poor business performance.  During this
> same time period, defendants HIRKO, YEAGER and SHELBY sold large
> quantities of Enron stock, generating millions of dollars for themselves.

(Instrument No. 468, at 3-4).

The misrepresentations and omissions underlying both the securities fraud and wire fraud

charges involve the same general topics, *i.e.*, allegedly overstating the developmental status or

capabilities of the EBS network control software or Broadband Operating System ("BOS") and

thereby overstating the current success of the business. The securities fraud count specifically relates

to allegedly false statements and omissions at the January 20, 2000 Analyst Conference, and the wire

fraud counts specifically relate to false statements and omissions contained in press releases issued

by EBS. (*See id.* "Overt Acts" at ¶ 36). In Paragraph 33 of the Indictment, the government provides

a temporal link between the wire and securities fraud charges and the insider trading counts, alleging

---

[2] None of the allegations pertaining to the Braveheart Transaction, and alleged false statements at the January 2001 Analyst Conference are relevant to the charges and evidence against Defendant Hirko. Thus, the Court need not address these allegations in the context of the current Motion.

that "[a]t the time when they and others at Enron were making materially false and misleading public statements about EBS, the defendants sold large quantities of Enron stock, generating huge profits. Specifically, between January 20, 2000 and July 28, 2000, HIRKO sold $35,167,761.41 worth of Enron stock." (*Id.* at ¶ 33).

The Indictment does not differentiate what material non-public information Defendant Hirko allegedly possessed and used on each of the dates alleged in the insider trading counts. Rather, the Indictment alleges that "while in possession of material non-public information regarding the technological capabilities, value, revenue and business performance of Enron Communications, Inc. and Enron Broadband Services, HIRKO sold shares of Enron stock . . . generating total proceeds of $35,167,761.41." (*Id.* at ¶ 46). The Indictment then lists the count number, date, number of shares, sale price, and gross proceeds of the stock sale. (*Id.*).

Paragraphs 1 through 33 do not specifically refer to the money laundering counts of the Indictment, or directly tie the money laundering counts to the overall scheme to defraud. However, the acquitted money laundering counts against Defendant Hirko allege that Hirko engaged in "monetary transactions . . . in criminally derived property of a value greater than $10,000 . . . [by] transfers of funds generated through wire fraud and fraud in the sale of securities . . ." The Seventh Superseding Indictment essentially mirrors the substantive factual allegations and format of the Fifth Superseding Indictment. (Instrument No. 915).

**B.**

**1.**

After a 3-month trial by jury, the jury entered a verdict of "not guilty" on two insider trading counts against Defendant Hirko, including Count 23 charging Defendant Hirko with insider trading on February 18, 2000; and Count 24 charging Defendant Hirko with insider trading on April 20, 2000. The jury also entered a verdict of "not guilty" on Counts 55 through 66, charging Defendant Hirko with money laundering in connection with monetary transactions on March 31, 2000 through September 21, 2000. The jury indicated that they were hopelessly deadlocked on the remaining insider trading, conspiracy, securities fraud, and wire fraud counts against Defendant Hirko.

Defendant Hirko argues that collateral estoppel should apply in this case because the money laundering counts, on which he was acquitted, alleged that Hirko engaged in monetary transactions with proceeds from criminally derived property through insider trading, securities fraud and wire fraud. Defendant Hirko argues that, because the  government relied on the same common nucleus of alleged misrepresentations and omissions to support the securities fraud, wire fraud and insider trading charges, the only rational way the jury could have acquitted Hirko of money laundering is by finding that the government failed to prove that he engaged in such misrepresentations and omissions, which underlie the insider trading, securities fraud, and wire fraud counts. In essence, the issue presented by Defendant Hirko ultimately asks the Court to determine whether the jury in the first trial rationally could have acquitted him of money laundering, without finding that the government failed to prove Defendant Hirko engaged in insider trading, securities fraud, or wire fraud.

12

In order to establish the crime of wire fraud the government must prove beyond a reasonable doubt that the defendant (1) knowingly devised or intentionally devised a scheme to defraud; (2) acted with a specific intent to defraud; (3) used or caused another person to use interstate wire communications facilities for the purpose of carrying out the scheme; and (4) that the scheme to defraud employed false material representations. *United States v. Odiodio*, 244 F.3d 398, 402 (5th Cir. 2001); (Instrument No. 854, at 34).

In order to establish the crime of securities fraud, the government must prove beyond a reasonable doubt that (1) in connection with the purchase or sale of securities, the defendant either (i) employed a device, scheme, or artifice to defraud, or (ii) made any untrue statement or material omission of fact, or (iii) engaged in an act of fraud and deceit; and (2) acted willfully, knowingly, and with the intent to defraud; and (3) used, or caused to be used, any means or instrumentality of interstate commerce or of the mails. (*Id.* at 26).

The crime of insider trading requires proof beyond a reasonable doubt that (1) in connection with the purchase or sale of securities, the defendant employed a device, scheme, or artifice to defraud; (2) the defendant acted willfully, knowingly, and with the intent to defraud; (3) used, or caused to be used, any means or instrumentality of interstate commerce; and (4) used material, nonpublic information in his purchase or sale of Enron stock. *United States v. Smith*, 155 F.3d 1051, 1066 (9th Cir. 1998); (*Id.* at 41-43).

In order to establish the crime of money laundering, the government must prove beyond a reasonable doubt that the defendant (1) engaged or attempted to engage in a monetary transaction; (2) the monetary transaction involved criminally derived property of a value greater than $10,000; (3) the property was in fact derived from a specified unlawful activity, that is, wire fraud or fraud

in the sale of securities; (4) the defendant acted knowingly, that is, with knowledge that the transaction involved proceeds of a criminal offense; and (5) that the transaction took place in the United States.

The insider trading, securities fraud, and wire fraud charges of the Indictment each have distinct and separate elements from the money laundering charges, and share no common elements with the money laundering charges. The money laundering charges against Defendant Hirko do, however, identify the funds at issue as "proceeds of specified unlawful activity, that is, wire fraud . . . and fraud in the sale of securities." Thus, a conviction of Defendant Hirko on the wire fraud counts of the Indictment would require evidence sufficient to show that Plaintiff engaged in a specified unlawful activity, *i.e.*, wire fraud, securities fraud, or insider trading. *See United States v. Tencer*, 107 F.3d 1120, 1130-32 (5th Cir. 1997). While an acquittal or dismissal of one of the predicate offenses (e.g., wire fraud, securities fraud, or insider trading) may call into question the validity of any money laundering charges based on that predicate offense, it is unclear whether an acquittal for money laundering would have any effect on the validity of the predicate offense. This is namely because none of the predicate offenses require a showing that the defendant engaged in a monetary transaction to conceal the proceeds of a criminal offense, in order to obtain a conviction on one of the predicate offenses.

Defendant Hirko contends, however, that "the only rational basis on which the jury could have acquitted Mr. Hirko on the 2000 Money Laundering Counts and the February and April 2000 Insider Trading Counts is by finding that he did not engage in the alleged misrepresentations and omissions that formed the common factual basis of the securities-fraud, wire-fraud and insider-trading counts in the Fifth Superseding Indictment." (Instrument No. 936, at 5). Specifically,

14

Defendant Hirko argues that "he did not contest that he engaged in the monetary transactions at issue or that the transactions involved proceeds from his sale of Enron stock in February, April and May 2000," and "[n]or did he contest that the value of such proceeds was greater than $10,000 or that the transactions at issue took place within the United States." (*Id.* at 7). Thus, Defendant Hirko asserts that "the only 'rationally conceivable issue in dispute' on the money-laundering charges was whether the misrepresentations and omissions Mr. Hirko allegedly made were sufficient to support the government's charges of wire fraud or insider trading." (*Id.*).

First of all, the money laundering counts of the indictment do not require a showing that the defendant made material misrepresentations or omissions. The money laundering counts only require a showing that the defendant knowingly engaged in monetary transactions to conceal property that was derived from a specified unlawful activity, in this case, wire fraud or fraud in the sale of securities. Under the circumstances of this case, the jury could have acquitted Defendant Hirko for any number of reasons, and not because the jury decided that the government failed to establish that Defendant Hirko committed wire fraud or fraud in the sale of securities. For example, the jury could have rationally come to the conclusion that the proceeds contained in the Paine Webber account no. HS 72449 were derived from the sale of stock that did not involve the proceeds of criminal activity. With regard to the amount of criminally derived funds necessary to find a violation of the money laundering statutes, the Court instructed the jury as follows:

> Where a defendant is charged under section 1957 with making a monetary transaction from an account containing money that is derived from criminal activity (i.e., "tainted" money), and money that is not derived from criminal activity (i.e., "clean" money), the government must prove beyond a reasonable doubt that there was more than $10,000 of tainted money in the account, and that the defendant transferred from the account an amount of money that exceeds the amount of clean money in the account by more than $10,000. When the aggregate amount withdrawn from an

15

account containing commingled funds exceeds the clean funds, individual withdrawals may be said to be of tainted money, even if a particular withdrawal was less than the amount of clean money in the account.

(Instrument No. 854, at 55-56).

Count 23 of the Fifth Superseding Indictment alleged that Defendant Hirko, while in possession of material non-public information, sold stock on February 18, 2000, resulting in gross proceeds of $6,465,798.63. Count 24 of the Fifth Superseding Indictment alleged that Defendant Hirko, while in possession of material non-public information, sold stock on April 20, 2000, resulting in gross proceeds of $9,236,589.18. At trial, the government directly linked the proceeds allegedly gained in the insider trading counts of the indictment with the amount of money allegedly derived from specified criminal activity (the "tainted funds") in the money laundering counts of the indictment. Government witness Maurice Whalen  testified that the net proceeds from the sale of 473,837 shares of stock at issue in Counts 23, 24, 25, and 26 amounted to $9,844,210.92 in net proceeds (gross proceeds - transaction costs). Maurice Whalen further indicated that Defendant Hirko deposited the entire $9,844,210.92 in net proceeds into Paine Webber account no. HS 72449, and transferred money out of account no. HS 72449 to form the basis of the money laundering Counts 55-65. According to Maurice Whalen's demonstrative exhibit, the only allegedly tainted funds that ever entered account no. HS 72449 (the source account of the monetary transfers) were the proceeds of the stock sales at issue in Counts 23, 24, 25, 26. (GX 3155).

Counts 23 and 24, on which Defendant Hirko received an acquittal, amounted to $5,082,358.39 of the $9,844,210.92 in net proceeds deposited into Paine Webber account no. HS 72449. Thus, the jury could have logically determined that account no. HS 72449 contained at least $5,082,358.39 in clean funds, which exceeds by more than $10,000 the $4,865,598.53 amount of

16

money allegedly laundered in Counts 55 through 63. It is unclear whether the jury applied a similar analysis to Counts 64 through 66, which alleged that Defendant Hirko laundered $4,995,920.96 in funds from account no. HS 72449. However, Maurice Whalen's demonstrative exhibit was not received in evidence, and the total amount of the gross proceeds allegedly gained from insider trading in Counts 23 through 24 amounted to $15,702,387.81, which exceeds the total $7,003,662.96 amount of money allegedly laundered in Counts 55 through 66. Because the aggregate amount of gross proceeds allegedly gained in Counts 23 through 24 exceeds the total amount of money charged in the money laundering counts, the jury could have rationally reached the conclusion that the amount of clean funds in account no. HS 72449, exceeded any possible tainted funds.

In addition, the offense of money laundering requires the government to prove that the defendant knew that the property involved in the monetary transaction constituted, or was derived from, proceeds obtained by some criminal offense. Defendant Hirko consistently testified that he engaged in the trades of Enron stock to diversify his portfolio, and not to take advantage of material non-public information. Based on the acquittal of Defendant Hirko on Counts 23 and 24, the jury could have logically come to the conclusion that Defendant Hirko did not know that the  money transferred from account no. HS 72449 involved proceeds obtained by some criminal offense.

## 2.

Defendant Hirko next contends that "there is no question that the government relied on the same common nucleus of alleged misrepresentations and omissions to prove the securities, wire-fraud and insider-trading counts. As a result, by determining that the government failed to prove such misrepresentations and omissions in acquitting Mr. Hirko of the February and April Insider Trading

17

Counts, the jury also necessarily determined that the government failed to prove that he engaged in such misrepresentations or omissions for purposes of the Securities and Wire Fraud Counts or the May 2001 Insider Trading Counts." (Instrument No. 26).

Over the course of the three-month long trial of the Defendants on the Fifth Superseding Indictment[3], the government presented a theory of prosecution that Defendants all participated in a single conspiracy aimed at falsely portraying the technological capabilities, value, revenue, and business performance of Enron Broadband Services. The government argued that the objective of the conspiracy was to increase the price of Enron stock, so that the Defendants could personally enrich themselves through stock sales, salary and performance bonuses. The government first presented evidence of the problems with EBS products and services leading up to the January 2000 Analyst Conference.

Specifically, the government presented evidence of problems with the Media Cast and Media Transport products. The government also presented testimony that the Interagent software did not function as network control software, and that the Enron Intelligent Network did not possess much intelligence. The government further presented evidence that the network had significant problems with security, an inability to control routers on the network, and an inability to perform billing and quality of service operations. In addition, the government presented evidence of internal arguments between EBS employees, including Rex Shelby, David Berberian, John Griebling, John Bloomer, Joe Hirko, and Scott Yeager.

---

[3] The first trial on the Fifth Superseding Indictment, conducted on April 18, 2005 through July 13, 2005, included all five Defendants charged in the Fifth Superseding Indictment -- Joseph Hirko, Kevin Howard, Scott Yeager, Rex Shelby, Michael Krautz. After trial, the government later severed the Defendants into three separate indictments, charging Defendants Howard and Krautz in the Sixth Superseding Indictment, charging Defendant Yeager in the Seventh Superseding Indictment, and charging Defendants Shelby and Hirko in the Eighth Superseding Indictment.

As the first component of the scheme to defraud, the government presented press releases in the latter part of 1999, and testimony that the press releases did not comport with the problems facing EBS. The government further presented evidence of statements made at the January 2000 Analyst Conference. The government argued that Defendants made false and misleading statements about the EBS fiber network, proprietary software, and technological capabilities of EBS. Specifically, the government pointed to statements claiming EBS had an advanced network control software or BOS software, and argued that each statement was false, misleading, or omitted a material fact. The government further argued that Defendants continued to issue false press releases with the purpose of driving up the stock price. Finally, the government argued that Defendants Hirko, Shelby, and Yeager sold large blocks of Enron stock, in order to take advantage of the rising stock price, which resulted from the overall scheme to defraud the investing public at the 2000 Analyst Conference and in press releases.

With respect to Defendant Hirko the government argued that Hirko failed to disclose inside information about the problems with the EIN and within EBS, at the January 2000 Analyst Conference. The government further argued that the object of Defendant Hirko's alleged participation in the scheme to defraud and failure to disclose the "truth" about EBS at the January 2000 Analyst Conference, culminated in his sale of Enron Stock when the public did not know the "truth" about EBS. After the January 2000 Analyst Conference, the government introduced evidence that Defendant Hirko attended offsite meetings in February and March 2000, in which EBS employees reported on problems with EBS products, the network, and the EIN. The government also presented evidence that on April 20, 2000, Hirko received a Coordinated Engineering Plan from Larry Ciscon which showed no timetable for the completion of any EBS software development

19

efforts and showed that none of the projects were concluded or released. The government further presented evidence that Hirko participated in the approval of press releases on April 11, 2000 and May 15, 2000, which allegedly contradicted known limitations of EBS' technological capabilities and progress.

Defendant Hirko summarizes his theory of defense and disputed issues on the insider trading counts as follows:

> [Mr. Hirko] did not dispute that he was an "insider" or that he knowingly exercised options and sold stock on the dates alleged by the government. Nor did he dispute that he used or caused to be used a means or instrumentality of interstate commerce. Instead, he focused on the fact that he did not engage in any of the alleged misrepresentations and omissions that formed the basis of the "insider information" that the government claimed he possessed and used.

(Instrument No. 936, at 21).

Defendant Hirko's summary of disputed issues alone gives the Court no indication of what particular issues the jury necessarily decided in acquitting Defendant Hirko of the February and April 2000 insider trading counts. First of all, insider trading does not specifically require proof of a false or misleading statement or omission of material fact, as is required to establish a charge of wire fraud and which was alleged in the securities fraud charges.[4] Rather, insider trading requires proof that the defendant used material, nonpublic information in his purchase or sale of corporate stock. Thus, the fact that Defendant Hirko received an acquittal on insider trading would not have any bearing on whether Defendant Hirko made misrepresentations and omissions of material fact at the 2000 Analyst Conference and in press releases. In sum, the Court cannot, in all practicality, determine

---

[4] For the crime of securities fraud, the making of an untrue statement or material omission of fact is ordinarily one of several acts that may satisfy the "scheme to defraud" element of securities fraud. Here, the government specifically alleged that Defendants "made false and misleading statements and omitted material information from statements made." (Instrument No. 468, at ¶ 11).

what particular issue the jury necessarily decided in acquitting Defendant Hirko of the February and April 2000 counts of insider trading. *See Deerman*, 837 F.2d at 690 ("When a fact is not necessarily determined in a former trial, the possibility that it may have been does not prevent re-examination of that issue.").

As Defendant Hirko states in his Motion to Dismiss, "there is no clear rationale for why the jury was unable to reach a determination on the May 2000 Insider Trading Counts [as opposed to the February and April 2000 Insider Trading Counts], other than sheer exhaustion following an extended trial and contentious deliberations." (Instrument No. 936, at 27). Defendant Hirko asserts that, "it would be far more speculative to place credence in the jury's failure to reach a decision on the May 2000 Insider Trading Counts than on its unanimous decision to acquit Mr. Hirko on the February and April Insider Trading Counts." (*Id.*). However, the collateral estoppel analysis under *Ashe v. Swenson* requires the Court to determine what the jury "necessarily decided," and not what it may have decided or may have failed to decide. Thus, the Court chooses not to accept Defendant Hirko's invitation and will not speculate any further as to what the jury may have determined in acquitting Defendant Hirko of Counts 23 and 24 of the Fifth Superseding Indictment. Accordingly, Defendant Hirko's Motion to Dismiss on Collateral Estoppel Grounds is DENIED.

## IV.

The Fifth Circuit has held that "even when a subsequent prosecution is not completely barred . . . collateral estoppel may bar the admission or argumentation of *facts* necessarily decided in the

first trial." *Brackett*, 113 F.3d at 1400. However, "[a] general verdict of acquittal, exculpating the defendant of liability for a substantive offense, does not estop the government from introducing the same evidence in a subsequent prosecution for conspiracy to commit the same offense." *Id.* (citing *United States v. Garza*, 754 F.2d 1202, 1209 (5th Cir. 1985). "A general verdict of acquittal merely indicates that the government has failed to convince the jury, beyond a reasonable doubt, of at least one essential element of the substantive offense; it does not 'necessarily determine' any facts at issue in the conspiracy trial." *Id.*

When the acquittal of a substantive offense does not completely bar a subsequent prosecution for conspiracy to commit the same offense, the Fifth Circuit in *United States v. Brackett* recognized the following:

> the government may introduce evidence of an alleged criminal act, notwithstanding the fact that the defendant previously has been acquitted of the substantive offense, to prove participation in a conspiracy to commit the substantive offense. Overt acts in furtherance of a conspiracy need not be criminal; therefore, acquittal for the substantive offense does not bar the admission of the same evidence in a subsequent conspiracy trial. Merely because appellants were acquitted of the substantive . . . charges does not mean that the facts upon which the charges were based cannot later be used as non-criminal overt acts in furtherance of the conspiracy to commit the substantive offense.

113 F.3d at 1400 (internal quotations and citations omitted).

In *Dowling v. United States*, 493 U.S. 342 (1990), the Supreme Court held that "an acquittal in a criminal case does not preclude the government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof." *Id.* at 349. Thus, the collateral estoppel doctrine "only bars relitigation of a previously rejected factual allegation where that fact is an ultimate issue in the subsequent case." *Wright*, 11 F.3d at 546. "A general verdict of acquittal does not [however] 'necessarily decide' an ultimate issue of fact but merely indicates that the

22

evidence was not sufficient to prove every element of the offense beyond a reasonable doubt." *Brackett*, 113 F.3d at 1401; *see also id.* at 1401 n.9 (stating that *"Dowling* calls into question the line of cases holding that collateral estoppel may bar the admission or argumentation of facts necessarily decided in the first trial, even if the subsequent prosecution is not completely barred.").

In order to prove the existence of a conspiracy to commit wire and securities fraud, the government must prove beyond a reasonable doubt that the defendant (1) made an agreement to commit the crime of wire or securities fraud; (2) knowingly and willfully joined into the agreement; and (3) one of the conspirators committed at least one overt act. (Instrument No. 854, at 14). In this case it is unclear what the jury "necessarily determined" when it acquitted Defendant Hirko of twelve counts of money laundering and two counts of insider trading. As stated previously, Defendant Hirko has failed to meet his burden of establishing that the jury "necessarily determined" that Defendant Hirko did not engage in misrepresentations and omissions underlying the securities fraud, wire fraud, and insider trading counts.

The ultimate issue in a conspiracy case is whether Defendant Hirko knowingly participated in an agreement to commit wire and securities fraud. "The admissibility of evidence relevant to an ultimate issue is governed by Fed. R. Evid. 401, which defines 'relevant evidence' as evidence 'having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Brackett*, 113 F.3d at 1401-02. Defendant Hirko has not identified any specific facts that the jury necessarily decided in the first trial, which should not be introduced in a subsequent trial. However, evidence concerning the material non-public information available to Defendant Hirko, and alleged misrepresentations and omissions made at the January 2000 Analyst Conference and in press releases

are certainly relevant to the charge of conspiracy to commit wire and securities fraud. Accordingly, collateral estoppel does not bar the government from introducing evidence originally offered in the first trial. The admissibility of that evidence is a purely evidentiary matter based on the relevance of that information.

## V.

The government contends that Defendant Hirko's Motion to Dismiss on Collateral Estoppel Grounds is frivolous and requests that the Court make such a finding in this Order, so that the government may proceed with trial as scheduled. In *Abney v. United States*, 431 U.S. 651 (1977), the Supreme Court recognized a statutory right to pretrial interlocutory appeal of the denial of a motion to dismiss an indictment on the basis of double jeopardy. The Court emphasized that the rights conferred under the Double Jeopardy Clause "would be significantly undermined if appellate review of double jeopardy claims were postponed until after conviction and sentence" because the Double Jeopardy Clause is not only a protection against twice being convicted, but is also a "guarantee against being twice put to trial for the same offense." *Id.* at 660-61. *See also United States v. Angleton*, 221 F. Supp. 2d 696, 734 (S.D. Tex. 2002). The Supreme Court noted, however, that its holding may encourage "dilatory appeals," and that such "problems of delay" may be ameliorated by expedited appeals and procedural rules. *Id.* at 662 n.8.

In *United States v. Dunbar*, 611 F.2d 985, 987 (5th Cir. 1980), the Fifth Circuit set forth procedural rules for dual jurisdiction of trial and appellate courts during interlocutory appeals from orders denying motions to dismiss based on double jeopardy. The court held that:

24

> Henceforth, the district courts, in any denial of a double jeopardy motion, should make written findings determining whether the motion is frivolous or non-frivolous. If the claim is frivolous, the filing of a notice of appeal by the defendant shall not divest the district court of jurisdiction over the case. If non-frivolous, of course, the trial cannot proceed until a determination is made of the merits of an appeal.

*Id.* at 988. The court further explained that "[i]f an appeal from a motion decided to be frivolous by the district court is found meritorious by the appellate court, [a] conviction in the district court would be reversed. If found not to have merit, jurisdiction for the trial which occurred during the appeal would be affirmed." *Id.* at 989.

In *United States v. Kalish*, 690 F.2d 1144 (5th Cir. 1982), the Fifth Circuit explained that "district courts must adhere to the literal meaning of the term 'frivolous,' and that [the] court [would] carefully scrutinize . . . findings of frivolousness." *Id.* at 1154 (stating that "[t]he whole purpose of *Abney* is defeated when district courts proceed to trial because they do not believe the defendant's double jeopardy plea is sufficiently meritorious to warrant a stay"). The court further noted that *Dunbar* was intended to prevent *dilatory* claims, not *colorable* ones. *Id.* (emphasis added). *See also Richardson v. United States*, 468 U.S. 317, 326 n.6 (1984) (stating that "[a] colorable claim, of course, presupposes that there is *some possible validity* to a claim") (emphasis added).

In *United States v. Angleton*, 221 F. Supp. 2d 696 (S.D. Tex. 2002), the Court found that "double jeopardy claims are not frivolous when the claim is complicated or raises legal issues not clearly foreclosed by binding precedent, even if the claim is rejected on the merits." *Id.* at 736. *See e.g., United States v. Kress*, 58 F.3d 370 (8th Cir. 1995) (finding double jeopardy claim not frivolous considering the depth of the district court's analysis, notwithstanding that the Eighth Circuit found the claim unsuccessful); *United States v. McHan*, 966 F.2d 134 (4th Cir. 1992) (finding double jeopardy claim not frivolous where determination of whether indictments charged same offense

required a complex analysis); *c.f. United States v. LaMere*, 951 F.2d 1106 (9th Cir. 1991) (finding that purely legal claims are frivolous when the outcome is "clear" upon "long-standing case law" binding in that circuit).

In this case, Defendant Hirko argues that his acquittal of several counts of the indictment precludes the government from re-trying him on the deadlocked counts of the indictment. Specifically, Defendant Hirko argues that the unifying theory of the government's prosecution and the overlapping elements and methods of proof on the acquitted and hung counts show that the jury necessarily decided that the government failed to prove Defendant Hirko engaged in the common misrepresentations and omissions underlying the securities fraud, wire fraud, and insider trading charges. As stated previously, however, the Court finds that Defendant Hirko has failed to meet his burden of demonstrating that the jury or the Court "necessarily decided" any ultimate issue in the first trial. Although the Court finds that Defendant Hirko's collateral estoppel argument lacks merit, the Court finds that Defendant Hirko made a good faith colorable claim of collateral estoppel, rather than a dilatory or frivolous claim with no arguable basis in fact or law.

Defendant Hirko's collateral estoppel argument required a fact-intensive analysis of the indictment, testimony, court's instructions to the jury, and jury's verdict. This case involved a lengthy multiple-count indictment with charges that alleged similar conduct, similar offenses, similar time frames, and a similar motive and intent to defraud. Thus, the fact-intensive collateral estoppel analysis required in this case, after Defendant received acquittals on several counts, greatly differs from a purely legal analysis involving dissimilar charges or dual sovereignty issues with clearly defined legal precedent. In addition, Defendant Hirko filed the present motion in a timely manner, several months prior to the scheduled trial date, indicating a good faith argument for dismissal, rather

26

than a dilatory attempt to delay trial. Accordingly, the Court finds that Defendant Hirko's Motion to Dismiss on Collateral Estoppel Grounds is non-frivolous.


## VI.


IT IS HEREBY ORDERED that Defendant  Defendant Joseph Hirko's Motion to Dismiss Counts 2 through 6, 25 and 26 of the Fifth Superseding Indictment and Counts 2 through 6 of the Seventh Superseding Indictment on Grounds of Collateral Estoppel **(Instrument No. 935)** is **DENIED**.

The Clerk shall enter this Order and provide a copy to all parties.

SIGNED on this the _31st_ day of August, 2006, at Houston, Texas.


**VANESSA D. GILMORE**
**UNITED  STATES  DISTRICT  JUDGE**